Statement of the Case.
MONROE, C. J.
Defendant, having obtained judgment against plaintiff, caused execution to issue, by virtue whereof the sheriff seized, as the property of plaintiff, and on his premises, one mule, 700 pounds of seed cotton, and seven acres of peanuts hanging by the roots, also, on the premises of plaintiff’s father, one bale of lint cotton. Plaintiff thereupon filed a sworn petition alleging that the property seized which he specified belonged to him, and that the mule and peanuts were not subject to seizure, and praying that the sheriff be enjoined from further proceeding in the matter of their seizure, and he obtained the injunction as prayed for. His father at the same time filed a petition of intervention, setting up title to the seed and lint cotton, alleging that he had bought it from his son, and had credited $79.88 as the price upon his son’s indebtedness to him, amounting to $126. In the alternative he alleged that, should it be held that he is not the owner of the cotton, he is entitled to a lien and privilege on it to secure the sum of $75 which he advanced for the purchase of provisions and supplies used in the making of the cotton and other crop seized, and which were furnished with the understanding that the money was to be reimbursed from said crops. The petition, like that of plaintiff, was verified by the affidavit of the petitioner, and an order was made thereon for the separate appraisement of the property described, etc. Some two weeks later plaintiff filed a supplemental petition making the sheriff a party defendant, and praying for judgment against him in solido with the original defendant. Defendant then answered, putting the petitions at issue, and the case was tried, with the result that there was judgment for plaintiff perpetuating the injunction, ordering that the mule and peanuts be returned to plaintiff, and condemning Stovall & Sons to pay to plaintiff $25 as attorney’s fees. What disposition was made of the intervention or of the cotton therein claimed does not appear. Defendant (Stovall & Sons) took the appeal, and several months after it had been lodged in this court plaintiff filed an answer, praying that the award in his favor be increased by an allowance of $53 for loss of the serv *223 ice of the mule. Defendant has moved that the prayer be not considered, on the ground that plaintiff was granted a devolutive appeal, which he abandoned, and cannot now be heard asking for an amendment of the judgment.
The immediate questions to be here decided concern the peanuts, but the decision of those questions involves a consideration of most of the facts developed on the trial, which facts we find to be as follows:
At the time of the seizure defendant was married, had a dependent family, and did not own property to the value of $2,000. He was farming upon a tract of land containing 120 acres, for which, according to his oral testimony, he had five years before agreed to pay $750, in annual installments, but had paid only $150, and, as we infer, was considerably in default with respect to such payments. He also testified that he had received a bond for title, and upon the request of defendant’s counsel stated that (with the consent of his own counsel) he would produce it, which he never did. The judgment under which the seizure was made was rendered in March, 1915, and had been anticipated for some time, and the seizure was made in October. Plaintiff appears to have had some misgivings from the time of the institution of the suit lest, under the judgment when obtained, two mules and a cow owned by him should be seized, and, probably in February, he attempted to negotiate an arrangement with Leslie Caskey, a young neighbor, the purpose of which was to place Caskey in the position of an apparent vendee of those animals, and thus to screen them from the pursuit of the defendant. Caskey appears to have declined to take care of both mules, but there were transactions about one of them and the cow concerning which, as the parties subsequently disagreed, there is a conflict in their testimony. The purpose of those transactions is, however, made entirely clear by the testimony of plaintiff.
Thus, after having made a good many statements which were irreconcilable with each other, he was asked what his idea was in returning to Caskey immediately $20 which he had received as the price of the cow, and his reply was:
“Simply because this man [referring to Caskey’s father, who was a party to the negotiations] came to me, simply because I didn’t know anything about the law, and he claimed they [referring to the defendant herein] would -get my stuff, and they overpersuaded me because I didn’t know what to do.”
He subsequently concluded, and was probably advised, that his mules and cow were exempt from seizure, and towards the conclusion of his testimony, in reply to questions propounded by his own counsel, he said that he realized that they were exempt, and that “it wouldn’t be necessary to sham them off” to protect himself. The other mule was sent to his father’s place, but, as at the time of the trial plaintiff had become satisfied that it was exempt, he frankly admitted that he still owned it. He alleged in his petition that the sheriff had “seized the following property belonging to your petitioner: One bale of cotton, marked B. F. F. No. 22; * * *
700 pounds of seed cotton, more or less.” And he made affidavit that he had “read and considered” the petition, and that the allegations of fact therein contained were true; but, when called as a witness, he testified that he had sold the cotton to his father some two or three weeks before the seizure, as it lay, in the seed, on his premises; that there were 1,997 pounds of it; that a week later, at the request of his father, he hauled, say, 1,297 pounds of it to a public gin (leaving the remaining 700 pounds on his place) and directed that it be ginned and baled for account of his father; that upon the same day, after it had been ginned and baled, he hauled the bale of lint cotton, which was marked with his initials, to his father’s premises (where it was seized), and there delivered it, hut that he then realized that *225 lie needed the seed to feed Ms cow with, so he bought it back, for about $8, which he paid in cash, and took it home with him. He accounts for the fact that the man in charge of the gin marked the bale with his initials, instead of his father’s, by saying that it must have been a mistake, and he was corroborated in that by the man himself, who was Ms brother-in-law, and who in the two years that he worked at the gin had made but one other such mistake. It soon developed that plaintiff did not know the difference between selling and giving in payment, and that, what he meant to say was that he had given the cotton to his father in payment, or part payment, of a debt of $126 that he owed him, which debt is said to have originated as follows, to wit: His father paid $35 for him as the balance of the price of a wagon that he bought in 1914, and settled a debt of $65, which he had contracted to Caskey for money received, either as a loan (according to plaintiff’s testimony) or as the nominal price of the mule to which we have referred (according to Caskey’s testimony), and the balance of $26 represented money loaned to him by his father during the year 1915.
Charles F. Fallin, the father, alleges in his intervention, and swears to the truth of his allegations, as follows:
“That he is the owner of one bale of cotton marked B. F. F. No. 22, and 625 pounds of seed cotton, seized by the sheriff, * * * that he bought said cotton in the seed from his son, B. F. Fallin; * * * that since buying said cotton in the seed he had enough of it hauled to the gin by his son to make, and out of which was made, the said bale; * * * that he gave B. F. Fallin credit for $79.88 on an indebtedness of $126 which said B. F. Fallin owed petitioner. * * *
“That he furnished the said B. F. Fallin the sum of $75 in money of said indebtedness of $126 for the purpose of buying provisions and supplies, * * _ * upon which said B. F. Fallin did make said cotton and other property seized ; * * * that said B. F. Fallin used said money in buying provisions and supplies on which he made and cultivated said cotton; that said money was furnished said B. F. Fallin after the 1st day of April, 1915, and before the cultivation of said cotton had been completed by him; that he furnished said money to said B. F. Fallin with the distinct understanding that the said money was to be paid back to the petitioner out of the said cotton and other crop raised, and that, if it be held that said cotton or any part thereof is not the property of petitioner, then in such event petitioner has a lien and privilege on said cotton, not declared to belong to him for said money furnished; * * * that he has a lien and privilege on the seven acres of peanuts seized, * * * for and in the sum of $75 furnished to said B. F. Fallin for the purpose and in the manner above set forth. * " * Petitioner shows and avers that the said $75 which he furnished his said son was actually advanced and used for the purchase of necessary supplies and the payment of necessary expenses in cultivating and making said cotton and peanuts.”
On the trial of the case there was no pretense on the part of either plaintiff or intervener that the former had borrowed or the latter loaned $75. Plaintiff at first testified that he owed his father “$126, all told,” and afterwards, in answer to a leading question, said that his father had advanced $17 for him in the fall of 1914 which was not included in the $126. He also testified that the $126 was made up of the two items $35 and $65 to which we have referred, and $26, consisting of two loans of $10 each, and one loan of $6, made during the year 1915 with the understanding that the money was to be repaid from or when he made his crop. The testimony of Charles F. Fallin in regard to his son’s indebtedness and the alleged sale of the cotton reads, in part, as follows:
“Q. How much did he owe you? A. $126. Q. Did he owe you anything else? A. He owed me $17 that I neglected putting in. Q. What did he owe you that $126 for? [He here gives the items $35 and $65 heretofore mentioned, and proceeds:] A. He owed $26 that he got from me last spring. * * * Q. Well, the cotton that he let you have, what was that to apply on? A. The general debt, the $126, the whole indebtedness. * * * 2. The $26 you let him have through the year, what did you let him have that for? A. I let him have it to make his crop.”
Cross-examination:
“Q. Mr. Fallin, you stated that you were over at your son’s place at the time the cotton was picked? A. Somewhere right after it was picked. Q. You stated that you didn’t know just where you saw him? A. I don’t know; it was *227 probably right at his house. Q. Where did you have the conversation about the cotton? A. At his house there, about the house, on the place. Q. You don’t know whether it was right at his house? A. It was on his' place; yes, sir. Q. You can’t state whether it was at the house or in the field? A. I don’t remember whether it was right in the yard, but it was on his place. Q. What delivery was made to you of that cotton? A. There wasn’t any, except the bale he was to carry to the gin. * * * Q. You didn’t receive it when you receipted for it? A. No, sir; I left it there at his house. * * ’,|! Q. Now, Mr. Fallin, at the time you gave your son this receipt for this seed cotton, or within a short time before that, what conversation did you have with him with reference to the Stovall judgment? A. My understanding was that they had a judgment against him, and I bought that cotton to get my money, because they were more able to wait than I was. I had paid that money and I bought the cotton to hold it, honest, square, bought it. Q. You went' over there and bought this cotton and gave your receipt to your son so that Stovall couldn’t get it by reason of their judgment? A. Yes, sir. * * * Q. Now. about this $26 that you advanced for supplies, do you know what supplies were gotten with that money? A. No, sir. * * * Q. As a ma'tter of fact, didn’t you lend him that money just as any father would? A. Sure ; he had it in his possession to do what he pleased with it. Q. He first borrowed the money from 3>-ou and was' going to pay it back to you when he made his crop? A. Yes, sir. * * * Q. When he sold his crop and got his money? A. When he sold his cotton. * * * Q. What was said at the time he borrowed the money about your having the right or privilege on his cotton? A. He 3vas to let me have my money out of the crop — out of the cotton. Of course the cotton was supposed to pay it, as far as it would last. Q. That was what you expected to make it out of? A. Yes, sir; because I couldn’t have gotten it out of the other because he needed it.”
The evidence, as we understand it, shows that plaintiff had married and settled on the place in question in 1912, but it does not appear that he made any crop during that year. However that may be, he testifies that he raised peanuts in 1913 and 1914, and that he sold the crops of both years. Moreover, he was unable, or unwilling, to say that it was not his intention to sell the crop of 1915, and his testimony discloses no condition which made it any more necessary, as a supply or provision crop, during that year than during the preceding years.
Opinion.
[1, 2] Plaintiff invokes C. C. 465, C. P. 645, and Const, art. 244, which provide, respectively, as follows (quoting in part):
Article 465, C. C.:
“Standing crops and the fruit of trees not gathered and trees before they are cut down, are likewise immovable, and are considered as part of the land to which they are attached.”
Article 645, C. P.:
“Nor, can he (sheriff or constable) seize the agricultural implements, and working cattle, separately from the land to which they are attached ; nor the corn, fodder, hay, provisions, and other supplies necessary for carrying on the plantation to which they are attached, for the current year.
“And in addition to the property, and effects exempted' as aforesaid, there shall also be exempted * * * 160 acres of ground, and the buildings and improvements thereon occupied as a residence, and bona fide owned by the debt- or, having a family; * * * also, one work horse, one wagon or cart, one yoke of oxen, two cows and calves, twenty five head of hogs or 1,000 pounds of bacon or equivalent in pork; and, if a farmer, the necessary quantity of corn and fodder for the current year. * * * ”
Article 244, Const.:
“There shall be exempt from seizure * * * except as herein provided, * * * the homestead, bona fide, owned by the debtor and occupied by him, consisting of lands, not exceeding 160 acres, buildings, * * * whether rural or urban, of every head of a family ; * * * also two work horses, one wagon or cart, one yoke of oxen, two cows and calves, twenty five head of hogs, or 1,000 pounds of bacon or its equivalent in pork, whether these exempted objects be attached to a homestead or not, and on a farm the necessary quantity of corn and fodder for the current year, and the necessary farming implements, to the value of $2,000.”
Act 1SS of 1904 provides:
“That standing timber shall remain an immovable, and be subject to all the laws of the state on the subject of immovables, even when separated in ownership from the land on which it stands: Provided that nothing in this act shall be construed as altering, affecting or modifying existing laws relative to the assessment and taxation of such timber.”
Standing timber, though by law, if not by nature, made part of the land to which it is attached, may, however, be separated in ownership from the land, even as the title *229 of the land itself may be dismembered so that the surface rights become vested in one person and the subsurface or mining rights in another, and there are many thousands of acres of land in this state the titles to which are so dismembered, as there have been, and perhaps are, many thousands of orange and pecan trees the ungathered fruit of which has been sold to one person whilst the ownership of the trees and of the land upon which they stand has remained in another. The mere fact that standing crops, ungathered fruit, and trees before they are cut down are declared by the Civil Code to be immovables does not, therefore, of itself, furnish a reason why they should not be owned and seized separately from the land on which they are produced, and still less does it furnish a reason why things which become part of the land, and immovable merely by destination, should not be so owned and seized; hence the necessity, or supposed necessity, for article 645 of the Code of Practice. That article in its original form prohibited only the seizure of agricultural implements and working cattle separately from the land to which they were attached, and, when it was amended (by Acts 1843, p. 45), the amendment extended the prohibition only to “corn, fodder, hay, provisions, and other supplies necessary for carrying on the supply of the plantation, to which they were attached for the current year.”
It is evident that the word “attached,” as thus used in the original article, and repeated in the amendment, cannot be ignored, but must be recognized as of distinct significance, for the lawmaker seems to have gone out of his way to make use of it, and thereby to impose a limitation of some kind upon the restriction that he was placing upon the right of a judgment creditor to seize any property belonging to his debtor that he could find. Considering the question thus presented, we can conceive of no way by which a stranger to or mere tenant of a tract of land or a plantation can, in legal contemplation, attach thereto a plow, or mule, a bushel of corn, or a bundle of fodder; nor can we conceive that it wasi the purpose of the lawmaker to provide a means whereby the owner of 100 mules worth $25,000, could shield them from the pursuit of his creditors by placing them upon a tract of land, of which he was not the owner, as in a sanctuary. On the other hand, article 468 of the Civil Code declares that:
“The following things are immovable by destination when they have been placed by the owner for the service and improvement of a tract of land, to wit, cattle intended for cultivation. Implements of husbandry. Seeds, plants, fodder and manure. * * * All such movables as the owner has attached permanently to the tenement or to the building, are likewise immovable by destination.”
The owner, then, and the owner alone, has the faculty of placing movable objects upon his land under such conditions as to attach them to, and, with the aid of C. P. 645, make them inseparable from, it.
That view of the matter finds support, apparently, in subsequent legislative and constitutional enactments. In 1805 the General Assembly passed an independent statute, with no repealing clause (Act No. 33, p. 52, of 1865, Ex. Sess.), which appears to have been added to article 645 in the revision and re-adoption of the Code of Practice in 1870, and which declared that:
“In addition to the property and effects now exempt from seizure [the words ‘there shall also be exempt’ having apparently been omitted], * * * 160 acres of ground and the buildings, * * * occupied as a residence, and, bona fide, owned by the debtor, having a family; * * * also, one work horse, one wagon or cart; * * * and, if a farmer, the necessary quantity of corn and fodder for the current year,” etc.
And in 1879 there was incorporated in the Constitution of that) year, as a “homestead” provision, eo nomine article 219 et seq., which, taking the act of 1865 as a basis, extended the exemption therein granted to lands, “whether rural or urban,” within the *231 limit of $2,000 for all exemptions, but without limit as to the quantity of land “bona fide owned by the debtor and occupied by him as a homestead,” and exempted one work horse, one wagon or cart, etc. (as in the act of 1865), “whether those objects be attached to a homestead or not, and on a farm the necessary quantity of corn and fodder for the current year and the necessary farming implements.”
Article 244 of the present Constitution, as we have seen, limits the exempted land to 160 acres and exempts two work horses, instead of one, and it is otherwise the same (with respect to the matters now under consideration) as article 219 of the Constitution of 1879.
Applying the law as now existing to the facts of the instant case, we are of opinion that plaintiff has not shown that he is the owner of the land occupied by him, and that, in the absence of the assertion of rights by any such owner, or any mortgagee of the property, article 465 of the Civil Code and the first paragraph of article 645 of the Code of Practice have no bearing upon the issues here presented.
[3, 4] We are further of opinion that those issues are to be determined by that provision of article 244 of the Constitution which declares, in effect, that:
“There shall be exempt • ' * on a farm the necessary quantity of corn and fodder for the current year.”
The remaining question is whether plaintiff’s peanuts are “fodder” within the meaning of that provision. We think not. The word “fodder” is derived from the Anglo-Saxon “foda,” meaning “food,” and the first meaning attributed to it in Webster’s International Dictionary is “food,” and the second meaning by the same authority is “that which is fed out to domestic animals; esp., coarse food for cattle, horses, and sheep, as hay, vegetables,” etc. We have no doubt, therefore, that under some circumstances peanuts may be dealt with and regarded as fodder, and so perhaps, might celery, or water melons, or sugar, but those circumstances are not here disclosed. The evidence satisfies us that plaintiff’s peanuts were planted and intended to be sold just as he had planted and sold his two preceding crops, being the only two crops (so far as we are informed) that he had ever made. There is not a sjdlable of testimony to show that he or any one in that country has ever planted peanuts to be fed to cattle, or that the idea of so using the crop of 1915 had ever occurred to plaintiff until it was seized, or threatened with seizure, in this case, and the question whether it was at that time fodder, exempt from seizure, or a revenue producer liable to seizure is not to be determined by the considerations which then suggested themselves, for it appears from plaintiff’s admission and the testimony adduced by him that his then purpose was to defeat defendant’s execution by sham conveyances of his property which he must have expected that he would be called on to sustain by testimony. It is said that plaintiff’s affidavit verifying the allegations of his petition that he was the owner of the cotton was made by inadvertence, and that it was a “little, insignificant mistake,” but accepting counsel’s statement as to the inadvertence does not strengthen our confidence in plaintiff’s testimony; moreover, a petition for an injunction whereby a creditor is to be prevented from executing his judgment should be prepared and considered with at least sufficient deliberation to enable the petitioner to know what he is swearing to. The affidavit to the petition was, however, merely a cumulative incident, of which another was the affidavit of the intervener to the effect that he advanced plaintiff $75 for the purpose of buying provisions and supplies, and with the distinct understanding that he was to be paid from the cotton and *233 other crop, whereas as a witness he was able to testify to advances to the amount of only $26 for crop purposes, and that testimony fails to satisfy us that the transactions were otherwise than loans of money from father to son, which the borrower was to use as he pleased, and is conclusive to the effect that the lender had no expectation whatever of being reimbursed from the proceeds of the peanuts. The explanation that the affidavit was made inadvertently is not offered in this instance.
We may say in conclusion that this court, in cases such as this, is disposed to extend the fullest exemption that the law allows, but we think it is not asking too much to require that the beneficiaries should assert their claims in good faith and support them with credible testimony, since the rights of their creditors are also to be considered. That requirement has not been met by plaintiff, and he is not entitled to the judgment that he has obtained.
Defendant in its petition prays that its right to claim damages for the wrongful issuance of the injunction be reserved, and it also claims that it be allowed $50 damages as attorney’s fees. The amount of the damages in such eases is regulated by O. P. 304, which provides that:
“In case the injunction be dissolved, the court, in the same judgment, shall condemn the plaintiff and surety, * * * jointly and severally, to pay to the defendant interest at the rate of 8% per annum on the amount of the judgment, and not more than 20% as damages, unless damages to a greater amount be proved; and the sureties in such eases shall not be allowed to avail themselves of the plea of discussion.”
The judgment upon which the execution issued has not been copied in the transcript, and we have no means of knowing the amount, and, in view of that fact and of defendant’s prayer that its right to claim damages be reserved, we think it advisable to relegate the entire claim for damages (including attorney’s fees) to another proceeding. It is therefore ordered that the judgment appealed from be annulled, and that there now be judgment in favor of the defendant herein and against the plaintiff rejecting the demands of said plaintiff dissolving the injunction herein issued and dismissing this suit at his cost in both courts.
It is further ordered that the right of defendant to claim damages for the wrongful issuance of the injunction be reserved.